**FREEDOM HOLDINGS INC., d/b/a North American Trading Company, and International Tobacco Partners, Ltd., on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,**

v.

**Eliot SPITZER, in his official capacity as Attorney General of the State of New York, and Arthur J. Roth, in his official capacity as Commissioner of Taxation and Finance of the State of New York, Defendants–Appellees.**

**Docket No. 02–7492.**

United States Court of Appeals, Second Circuit.

Argued: Aug. 26, 2002.

Decided: Jan. 6, 2004.

David F. Dobbins, Patterson, Belknap, Webb & Tyler, LLP, New York, New York, for Plaintiffs–Appellants.

Avi Schick, Deputy Counsel to the Attorney General of the State of New York (Eliot Spitzer, Attorney General of the State of New York, Michael S. Belohlavek, Deputy Solicitor General of the State of New York, Daniel Schulze, Assistant Attorney General of the State of New York, of counsel), New York, New York, for Defendants–Appellees.

Before: WINTER, SACK, and SOTOMAYOR, Circuit Judges.

Judge SACK concurs in a separate opinion.

WINTER, Circuit Judge.

This appeal involves a challenge to New York legislation enacted pursuant to the settlement agreement of a host of various lawsuits brought by most of the states against the major tobacco manufacturers. Freedom Holdings Inc. and International Tobacco Partners, Ltd.—companies that import cigarettes for resale in New York from foreign manufacturers who are nonparties to the settlement agreement—appeal from Judge Hellerstein's dismissal of their complaint pursuant to Fed.R.Civ.P. 12(b)(6). The appellees are Eliot Spitzer, Attorney General of the State of New York, and Arthur J. Roth, Commissioner of Taxation and Finance of the State of New York, both officials with responsibility for enforcing the laws being challenged, New York Tax Law §§ 480–b, 481, subdiv. 1(c), and 1846 (the "Contraband Statutes").

The Contraband Statutes were passed in connection with the Master Settlement Agreement (the "MSA") executed by the country's four major tobacco manufacturers and most of the states. Appellants allege—and at this stage we must assume their allegations to be true—that New York's Contraband Statutes enforce a market-sharing and price-fixing cartel embodied in the MSA that allows the major tobacco manufacturers to charge supra-competitive prices, in exchange for sharing their monopoly profits with the State of New York.

Appellants challenge the Contraband Statutes on the grounds that: (i) they violate the Commerce Clause, U.S. Const. Art. I § 8, cl. 3; (ii) they are in conflict with Section 1 of the Sherman Act, 15 U.S.C. § 1, and therefore preempted; and (iii) New York's selective nonenforcement as to wholesalers and importers on Native American reservations violates the Commerce Clause and the Equal Protection Clause.

Appellees moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). The district court granted the motion, holding that: (i) the Commerce Clause is not violated because the Contraband Statutes do not favor local interests over out-of-state interests; (ii) the Contraband Statutes do not violate the antitrust laws because they are unilateral state action and are thus not prohibited by the Sherman Act under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); and (iii) under *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979), and *New York Ass'n of Convenience Stores v. Urbach*, 92 N.Y.2d 204, 677 N.Y.S.2d 280, 699 N.E.2d 904 (1998), appellants failed to state a valid equal protection claim.

Appellants renew their claims on appeal. We affirm the dismissal of the Commerce Clause claim. We reverse with respect to the Sherman Act claim because, based on the complaint's allegations, the *Parker* state action immunity doctrine does not immunize the Contraband Statutes from preemption by the Sherman Act. In that regard, we reach the same conclusion as did the Third Circuit in *A. D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir.2001). We remand the selective enforcement claim to allow the district court to elaborate on its ruling and appellants to amend their complaint. We begin with a Table of Contents.

*CONTENTS*

BACKGROUND ................................................210
a) The Master Settlement Agreement and Related New York Legislation ..............210
 1. Master Settlement Agreement ...........................210
 2. New York Escrow Statute...............................211
 3. New York's Contraband Statutes........................213
b) The Complaint and Proceedings in the District Court............................215

DISCUSSION ...............................................216
a) Dormant Commerce Clause Claim .......................................216
 1. Analysis Under the "Clear Discrimination" Standard and "Pike Balancing Test" ...............................................217
 2. Extraterritoriality Analysis...............................219
b) Sherman Act Claim ......................................222
 1. Preemption Analysis....................................222
 2. *Per Se* Violation.......................................223
 (i) Unilateral Act of State .............................223
 (ii) The Allegations of the Complaint ...................225
 3. State Action Immunity..................................226
 (i) Clear Articulation and Affirmative Expression ........226
 (A) Express Adoption of an Anticompetitive Scheme .....................227
 (B) State Policy Goals................................227
 (ii) Active Supervision ................................231
 4. The *Noerr–Pennington* Immunity .......................232
c) Equal Protection Claim....................................233

CONCLUSION ...............................................235

## BACKGROUND

### a) *The Master Settlement Agreement and Related New York Legislation*

We begin with a summary of relevant provisions of the MSA and related New York legislation as alleged in appellants' complaint. Because this appeal is from a dismissal on the pleadings, we assume the factual allegations of the complaint to be true.

### 1. *Master Settlement Agreement*

In 1997, the State, City, and the counties of New York filed suit against the country's major cigarette manufacturers. *See State v. Philip Morris, Inc.*, 179 Misc.2d 435, 686 N.Y.S.2d 564 (N.Y.Sup.Ct.1998). The action sought to recover damages related to the costs borne by these various political units of treating smoking-related illnesses and to impose restrictions on the cigarette manufacturers' sales, marketing, advertising, and disclosure practices. Similar actions were brought by 45 other states. These lawsuits were settled by execution of the MSA in November 1998. The settlement of the New York lawsuit was approved by the Supreme Court of New York, New York County, in a consent decree signed on December 23, 1998. *See* 179 Misc.2d at 451, 686 N.Y.S.2d 564.

The MSA was initially executed by the four dominant (alleged to account for 98% of cigarette sales at the time) cigarette manufacturers, Philip Morris, Lorrilard Tobacco, Brown & Williamson, and R.J. Reynolds (the "Original Participating Manufacturers," hereinafter "OPMs"), and by forty-six states (including New York), the District of Columbia, Puerto Rico, Ameri-

can Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands (the "Settling States"). Thirty-three additional, and smaller, tobacco companies (the "Subsequent Participating Manufacturers," hereinafter "SPMs" and, together with the OPMs, the "Participating Manufacturers," hereinafter "PMs") became parties to the MSA. It is alleged that, at that time, the PMs were responsible for 99% of cigarette sales.[1]

In general, the MSA imposes numerous restrictions and requirements in connection with the PMs' sales, marketing, advertising, lobbying, research, education, and disclosure practices. *See* MSA at 15–37. It also requires annual payments by the OPMs to the Settling States,[2] *see* MSA at 46–48, and releases the PMs from future claims by the Settling States, *see* MSA at 11–12, 93–101. Any non-participating cigarette manufacturer ("Non–Participating Manufacturer," hereinafter "NPM") may become a SPM by signing the MSA and making the payments that would have been due had it been a signatory as of the MSA execution date. MSA at 9, 13.

The OPMs' overall annual payment obligation is specified in the MSA.[3] *See* MSA at 47–48. This obligation is allocated among the OPMs in accordance with their relative market shares. *See* MSA at 48. Annual payments to the Settling States are to be adjusted according to changes in the overall volume of cigarette sales. *See* MSA at 48 & Exhibit E. A significant reduction in sales will therefore lead to a reduction in payments and state revenue.

We turn now to the specific provisions of the MSA that give rise to the present

---

1. It is unclear whether this market share is of sales nationwide or just in New York.

2. Receipt of settlement payments is allocated among the Settling States pursuant to a protocol set forth in Exhibit U to the MSA.

3. The nationwide base payments begin at $4.5 billion for the year 2000 and gradually increase to $9 billion in the year 2018 and each year thereafter.

action. In addition to the link between overall cigarette sales and payments to the Settling States noted above, there are provisions for changes in the payments required of particular companies due to changes in their market share. One such provision applies to market share losses by any OPM to other PMs. In general, an OPM losing market share pays less to the states; an OPM gaining market share pays more. *See* MSA at 46–47. Future payment obligations of SPMs—those arising after the initial payment made upon joining the MSA—occur only if a particular manufacturer's market share rises above the greater of (i) 100% of its 1998 market share, or (ii) 125% of its 1997 market share. Any future payments owed by SPMs are at a rate approximately equal to that paid by the OPMs. *See* MSA at 62–63.

Another provision governs the reduction of payments where market share is lost by an OPM to NPMs. This decrease is styled by the MSA as the "Non–Participating Manufacturer Adjustment" (the "NPM Adjustment") and reduces required payments if there are any losses of market share experienced by the OPMs as a result of "disadvantages" arising out of the MSA. MSA at 49–52. Given the allegations of this complaint, not to mention the name of the NPM Adjustment, we must assume that one of the contemplated "disadvantages" is price competition from NPMs. Because the NPM Adjustment trebles the decrease in payment obligations when an OPM loses more than 2% due to a "disadvantage," *see* MSA at 49, the loss of revenue to the Settling States from an NPM Adjustment is potentially substantial.[4]

Appellants allege that these market-share provisions constitute an "output cartel" that prevents price competition, leads to monopoly prices, and encourages Settling States to protect the cartel in order to preserve the revenue flow to the States. They claim that the effect of the market-share provisions is to deter competition among and between OPMs and SPMs as follows. Increases in a PM's market share would lead to increased payment obligations that offset or exceed profits from increased sales. The prospect of such increased obligations negates the incentive of PMs to compete through price competition. More than this, appellants allege that this disincentive induces cigarette manufacturers to follow price increases by a major manufacturer because there is little to be gained—increased market share will be offset or exceeded by increased payment obligations—by maintaining a lower price. Finally, they allege that large price and revenue increases have resulted from the MSA.

Of course, the described market-share provisions alone would reduce competition only until NPMs, who have not agreed to pay anything to the Settling States, charged less for their cigarettes and eventually gained market share at the expense of the PMs. However, the NPM Adjustment substantially reduces the payment obligations (trebled reductions for losses over 2%) of the OPMs in the face of such competition, providing incentives to the Settling States to protect the market share of the OPMs.

### 2. *New York Escrow Statute*

Under the MSA, the Settling States do not have to sit idly by while their MSA tobacco revenue is reduced over time by competition from NPMs. A Settling State can immunize itself from downward NPM Adjustments by enacting and "diligently

---

**4.** If the OPM's market share loss exceeds 16⅔ %, the decrease in payment obligations is somewhat less than the treble reduction for losses between 2% and 16⅔%. *See* MSA at 50.

enforc[ing]" a form "Escrow Statute"—attached to the MSA, *see* MSA at 53 & Exhibit B—requiring any NPM either: (i) to join the MSA (becoming a SPM and making future settlement payments accordingly with respect to any increased market share), or (ii) on a regular basis to place into a 25-year rolling escrow account funds alleged to be greater than the amount such manufacturer would pay were it a SPM under the MSA. All of the Settling States have enacted Escrow Statutes. *See* Compl. ¶ 19, at 10.

New York enacted its Escrow Statute on November 27, 1999. *See* N.Y. Pub. Health Law § 1399–nn to 1399–pp (2002). The Statute provides that any tobacco product manufacturer selling cigarettes directly or indirectly to consumers within New York shall either become a PM under the MSA, *see* N.Y. Pub. Health Law § 1399–pp(1), or make escrow payments, *see* N.Y. Pub. Health Law § 1399–pp(2).[5] Specifically, the statute requires that NPMs who sell cigarettes through a distributor, retailer, or similar intermediary place a per-pack fee into an escrow account that may be recovered by the NPM after twenty years if no obligation to the States has been incurred. The statute thus imposes a per-pack fee on NPM-manufactured cigarettes that adds to the resale price of the product. Although this fee does not expressly require the product to be sold at a particu-

---

5. New York's Escrow Statute provides in part as follows:

Any tobacco product manufacturer selling cigarettes to consumers within the state (whether directly or through a distributor, retailer or similar intermediary or intermediaries) after the effective date of this article shall do one of the following:

1. become a participating manufacturer (as that term is defined in section II(jj) of the master settlement agreement) and generally perform its financial obligations under the master settlement agreement; or

2. (a) place into a qualified escrow fund by April fifteenth of the year following the year in question the following amounts (as such amounts are adjusted for inflation):
 (i) 1999: $ .0094241 per unit sold after the effective date of this section;
 (ii) 2000: $ .0104712 per unit sold;
 (iii) for each of 2001 and 2002: $ .0136125 per unit sold;
 (iv) for each of 2003 through 2006: $ .0167539 per unit sold;
 (v) for each of 2007 and each year thereafter: $ .0188482 per unit sold.
 (b) a tobacco product manufacturer that places funds into escrow pursuant to paragraph (a) shall receive the interest or other appreciation on such funds as earned. Such funds themselves shall be released from escrow only under the following circumstances:

(i) to pay a judgment or settlement on any released claim brought against such tobacco product manufacturer by the state or any releasing party located or residing in the state. Funds shall be released from escrow under this subparagraph: (A) in the order in which they were placed into escrow and (B) only to the extent and at the time necessary to make payments required under such judgment or settlement;
(ii) to the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow in a particular year was greater than the state's allocable share of the total payments that such manufacturer would have been required to make in that year under the master settlement agreement (as determined pursuant to section IX(i)(2) of the master settlement agreement, and before any of the adjustments or offsets described in section IX(i)(3) of that agreement other than the inflation adjustment) had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer; or
(iii) to the extent not released from escrow under subparagraph (i) or (ii) of this paragraph, funds shall be released from escrow and revert back to such tobacco product manufacturer twenty-five years after the date on which they were placed into escrow.
N.Y. Pub. Health Law § 1399–pp (2002).

lar price, the cost to NPMs of complying with the Escrow Statute is alleged to be higher than the cost to PMs of complying with the MSA. Compl. ¶ 20, at 10–11.

According to the complaint, the Escrow Statute, by compelling NPMs to make payments—either by joining the MSA or by complying with the Escrow Statute—according to increased market share, effectively relieves the OPMs of price competition. *See* Compl. ¶¶ 17–23, at 9–12. For example, appellants claim that the payments required (either under the MSA or Escrow Statute) of SPMs for increased market share are prohibitively high—amounting to "penalties"—given the lower operating profit margins of these manufacturers compared to the OPMs. Appellants' Br. at 13–14. Appellants further allege that escrow payments required of NPMs under the Escrow Statute are even more prohibitively expensive because, unlike payments pursuant to the MSA, they are not tax deductible. *Id.* at 15. Appellants describe this elimination of competition as creating an "output cartel." *Id.* at 20.

### 3. *New York's Contraband Statutes*

Of course, if the Escrow Statute were either fully complied with or fully enforced, the cartel alleged would be immune to price competition. However, appellants allege that the market share of PMs actually declined between 1999 and 2002 from 99% to approximately 96%. *See* Note 1, *supra.* They attribute that decline to price competition from foreign NPMs that do not comply with the Escrow Statute. This residual non-compliance is alleged to result from difficulties in enforcing the Escrow Statute, in particular against foreign manufacturers, such as those from whom appellants purchased cigarettes for resale.

Effective December 28, 2001, New York passed the Contraband Statutes in response to this threat. In Governor Pataki's words, this legislation was needed to "bolster the State's ability to diligently enforce" the Escrow Statute, and thus to "help protect the State from further [NPM] adjustments." Appellants' Br. at 18. To be sold lawfully in New York, cigarette packages need to bear a tax stamp affixed by a New York State cigarette tax stamp agent. The Contraband Statutes add the requirements of the Escrow Statute to the "gatekeeper" functions already played by tax stamp agents. The Statutes label as contraband any cigarettes made by manufacturers that do not comply with the Escrow Statute. The effect alleged is to impose something analogous to an *in rem* liability on the cigarettes themselves, rendering them subject to seizure and forfeiture, in contrast to the *in personam* liability imposed on NPMs by the Escrow Statutes. Twenty-four of the Settling States have passed Contraband Statutes. *See* Appellants' Rule 28(j) letter.

It is the Contraband statutes, appearing in Sections 480–b, 481(c) and 1846 of the New York State Tax Law, that are the object of appellants' challenge. The particulars of the Statutes are as follows. Section 480–b requires cigarette manufacturers to certify annually, to the New York State Commissioner of Taxation and Finance, the Attorney General of the State of New York, and the cigarette tax stamp agents (according to appellants, usually wholesalers [6] responsible for affixing New York State cigarette tax stamps on such manufacturer's cigarettes), that such manufacturer is either: (a) a PM making payments under the MSA (i.e. satisfying Section 1399–pp(1) of the Escrow Statute) or (b) in compliance with the escrow require-

---

**6.** For purposes of this opinion, we use the terms "wholesalers" and "tax stamp agents" interchangeably.

ments of Section 1399–pp(2) of the Escrow Statute. N.Y. Tax Law § 480–b(1). Section 480–b also prohibits New York State cigarette tax stamp agents from affixing tax stamps to cigarettes if the relevant manufacturer has not provided the required certification or if the tax stamp agent has been notified by the Commissioner of Public Health that such manufacturer is in violation of the Escrow Statute. N.Y. Tax Law § 480–b(2).[7]

Section 1846 provides for seizure and forfeiture of any cigarettes that are unstamped or have been stamped in violation of Section 480–b. N.Y. Tax Law § 1846(a), (a–1).[8] Section 481, subdiv. 1(c)

7. Section 480–b provides in its entirety as follows:

§ 480–b. Prohibition against the stamping of certain cigarettes

1. Every tobacco product manufacturer as defined by section thirteen hundred ninety-nine-oo of the public health law whose cigarettes are sold for consumption in this state shall annually certify under penalty of perjury that, as of the date of such certification, such tobacco product manufacturer: (a) is a participating manufacturer as defined in subdivision one of section thirteen hundred ninety-nine-pp of the public health law; or (b) is in full compliance with subdivision two of section thirteen hundred ninety-nine-pp of the public health law. Such certification shall be executed and delivered to the commissioner, the attorney general and any agent who affixes New York state cigarette tax stamps to cigarettes of such tobacco product manufacturer, no earlier than the sixteenth day of April and no later than the thirtieth day of April of each year, and shall be accompanied by a list setting forth each of the cigarette brands of such tobacco product manufacturer sold for consumption in New York state. Agents shall retain such certifications for a period of five years.

2. An agent may not affix, or cause to be affixed, a New York state cigarette tax stamp to a package of cigarettes if either: (a) the tobacco product manufacturer of such cigarettes has not provided such agent with the certification required by subdivision one of this section; or (b) the commissioner has notified such agent that such tobacco product manufacturer is in violation of section thirteen hundred ninety-nine-pp of the public health law, or has filed a false certification under subdivision one of this section, and such agent has not been notified by the commissioner that such violation has ceased.

3. The commissioner shall prescribe the form of the certification required to be filed pursuant to subdivision one of this section.

N.Y. Tax Law § 480–b (2002).

8. Section 1846 provides, in pertinent part, as follows:

§ 1846. Seizure and forfeiture of cigarettes

(a) Whenever a police officer designated in section 1.20 of the criminal procedure law or a peace officer designated in subdivision four of section 2.10 of such law, acting pursuant to his or her special duties, shall discover any cigarettes subject to tax provided by article twenty of this chapter or by chapter thirteen of title eleven of the administrative code of the city of New York, and upon which the tax has not been paid or the stamps not affixed as required by such article or such chapter thirteen, they are hereby authorized and empowered forthwith to seize and take possession of such cigarettes, together with any vending machine or receptacle in which they are held for sale. Such cigarettes, vending machine or receptacle seized by a police officer or such peace officer shall be turned over to the commissioner. Such seized cigarettes, vending machine or receptacle, not including money contained in such vending machine or receptacle, shall be forfeited to the state. . . .

(a–1) Whenever a police officer designated in section 1.20 of the criminal procedure law or a peace officer designated in subdivision four of section 2.10 of such law, acting pursuant to his or her special duties, shall discover any cigarettes which have been stamped in violation of section four hundred eighty-b of this chapter, such officer

authorizes imposition of civil penalties upon any manufacturer or agent violating Section 480–b. N.Y. Tax Law § 481, subdiv. 1(c).[9]

b) *The Complaint and Proceedings in the District Court*

Appellants describe themselves as importers of tobacco products. Prior to enactment of the Contraband Statutes, appellants purchased cigarettes from foreign manufacturers and resold them with the necessary tax stamp to wholesalers and retailers in New York. However, the foreign manufacturers were neither PMs under the MSA nor making escrow payments under the Escrow Statute, and, therefore, were among the group described above whose continued sales caused the Contraband Statutes to be enacted. Because of the Contraband Statutes, cigarettes purchased by appellants from these manufacturers would be without the certification and tax stamp required for resale and would be subject to seizure and forfeiture.

Appellants therefore sought to enjoin enforcement of the Contraband Statutes on behalf of "all firms throughout the United States which purchase cigarettes made by manufacturers that do not make MSA settlement payments and do not make escrow payments pursuant to the New York State Escrow Statute, and which in turn resell such cigarettes to the wholesalers that have New York tax stamp licenses and resell such cigarettes in New York State." [10] Compl. ¶ 35, at 17. In effect, therefore, appellants are seeking to sell cigarettes in New York outside the scheme created by the MSA and enforced by the Contraband Statutes.

Appellants' complaint asserts the following claims:

(i) The Contraband Statutes interfere with interstate commerce in order to protect the payments owed to New York State under the MSA. This constitutes "favoritism, discrimination and economic protectionism" and is thus a *per se* violation of the Commerce Clause. Compl. ¶ 42, at 19.

(ii) By implementing the "output cartel" created under the MSA and the Escrow Statute, the Contraband Statutes conflict with the Sherman Act, 15 U.S.C. § 1, and are therefore preempted. Compl. ¶¶ 2, 46, at 3, 19–20.

(iii) The selective enforcement of the Contraband Statutes against firms like ap-

---

is hereby authorized and empowered forthwith to seize and take possession of such cigarettes, and such cigarettes shall be subject to a forfeiture action pursuant to the procedures provided for in article thirteen-A of the civil practice law and rules, as if such article specifically provided for forfeiture of cigarettes seized pursuant to this section as a preconviction forfeiture crime. Subdivisions (b), (c) and (d) of this section shall not apply to cigarettes seized pursuant to this subdivision.
N.Y. Tax Law § 1846 (2002).

9. Section 481, subdiv. 1(c) provides as follows:

In addition to any other penalties that may be imposed by law, the commissioner may impose a civil penalty not to exceed five thousand dollars against any tobacco product manufacturer or cigarette tax agent who violates the provisions of section four hundred eighty-b of this article, including but not limited to the filing of a false certification, and may seek to suspend or cancel any license which has been issued to such person pursuant to this chapter.
N.Y. Tax Law § 481, subdiv. 1(c) (2002).

10. The complaint does not specify whether appellants are themselves licensed New York State tax stamp agents. Because appellants are bringing suit only on behalf of that class of firms who resell cigarettes to "[wholesalers] having New York cigarette tax stamp licenses," Compl. ¶ 1, at 2, we consider appellants solely as "importers" and not as "wholesalers," or licensed New York State tax stamp agents.

pellants but not against wholesalers and importers on Native American Reservations situated within the State of New York, violates the Commerce and Equal Protection Clauses. Compl. ¶¶ 42, 49, at 19, 20.

After filing their complaint, appellants moved for a temporary order enjoining appellees from enforcing the Contraband Statutes. Appellees, in turn, moved to dismiss appellants' complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(1) and 12(b)(6). After the parties filed memoranda of law and argued, the district court dismissed the complaint under Rule 12(b)(6). This appeal followed.

## DISCUSSION

We review *de novo* a district court's dismissal of a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6). *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir.1996). We accept as true the material facts alleged in the complaint and draw all reasonable inferences in plaintiffs' favor. *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.1994). A complaint cannot be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### a) *Dormant Commerce Clause Claim*

The Commerce Clause provides that "Congress shall have Power ... [t]o regulate Commerce with foreign Nations and among the several States...." U.S. Const.

Art. I, § 8, cl. 3. Under the so-called "dormant" Commerce Clause doctrine, a state's power to take actions impacting interstate commerce is limited. *See Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 74 (2d Cir.1998).

A state statute may violate the dormant Commerce Clause in several ways. First, a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is "virtually invalid *per se*," *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 108 (2d Cir.2001); *see also Wyoming v. Oklahoma*, 502 U.S. 437, 454–55, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (noting that when a statute clearly discriminates against interstate commerce, it will be struck down as *per se* invalid), and can survive only if the discrimination is "demonstrably justified by a valid factor unrelated to economic protectionism," *id.* at 454, 112 S.Ct. 789. Second, if the statute does not discriminate against interstate commerce, it will nevertheless be invalidated under the "*Pike* balancing test" if it "imposes a burden on interstate commerce incommensurate with the local benefits secured." *Nat'l Elec. Mfrs.*, 272 F.3d at 108 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). Third, a statute will be invalid *per se* if it has the practical effect of "extraterritorial" control of commerce occurring entirely outside the boundaries of the state in question. *See Healy v. The Beer Inst.*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989).[11]

---

11. While an allegation of such a wholly "extraterritorial" effect has been analyzed by the Second Circuit as a form of "disproportionate[] burden" on interstate commerce under the *Pike* balancing test, *see Nat'l Elec. Mfrs.*, 272 F.3d at 109–10 (treating "control of commerce that occurs wholly beyond the state's borders" as a "disparate" burden triggering *Pike* balancing analysis), it may also be analyzed independently—i.e., without reference to clear discrimination or disparate burdens—as a question of regulatory jurisdiction rather than one of regulatory discrimination. *See Healy*, 491 U.S. at 336, 109 S.Ct. 2491 (considering a dormant Commerce Clause challenge to the extraterritorial effect of a state statute without reference to *Pike*); *Edgar v. MITE Corp.*, 457 U.S. 624, 643, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (plurality

Even assuming that appellants raised each of these theories in the district court and on appeal and that they are properly before us,[12] none constitutes a valid claim under any version of the dormant Commerce Clause doctrine.

1. *Analysis Under the "Clear Discrimination" Standard and "Pike Balancing Test"*

 A state statute violates the "clear discrimination" standard when it constitutes "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *see also West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) ("[T]he [dormant] Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit

in-state economic interests by burdening out-of-state competitors." (internal citation and quotation marks omitted)).

 In contrast, under the *Pike* balancing test, appellants must show that a statute enacted for a legitimate public purpose, although apparently evenhanded, actually imposes "'burdens on interstate commerce that exceed the burdens on intrastate commerce,'" *Automated Salvage Transp.*, 155 F.3d at 75 (quoting *Gary D. Peake Excavating Inc. v. Town Bd. of Hancock*, 93 F.3d 68, 75 (2d Cir.1996)), and that those excess burdens on interstate commerce are "clearly excessive in relation to the putative local benefits," *Pike*, 397 U.S. at 142, 90 S.Ct. 844. "[T]he statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *Nat'l Elec. Mfrs.*, 272 F.3d at 109. Under the *Pike* test, "if no such

opinion) ("The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, 'any attempt "directly" to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power." ' (quoting *Shaffer v. Heitner*, 433 U.S. 186, 197, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977))); *Automated Salvage Transp.*, 155 F.3d at 77–78 (noting that "[t]he Commerce Clause 'precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, *whether or not the commerce has effects within the State.*" ' (quoting *Edgar v. MITE Corp.*, 457 U.S. at 642–43, 102 S.Ct. 2629 (plurality opinion)) (emphasis added)); *see also Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 79 (1st Cir.2001), *aff'd*, 538 U.S. 644, 123 S.Ct. 1855, 1870–71, 155 L.Ed.2d 889 (2003) (considering extraterritorial effect as an independent, *per se* ground for a statute's invalidation under the dormant Commerce Clause); *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir.1995) (same).

**12.** Appellants' complaint arguably asserts only the first, "clear discrimination" form of

dormant Commerce Clause violation, *see* Compl. ¶ 42, at 18–19 ("[The Contraband Statutes] constitute[] a direct interference with interstate commerce.... Such favoritism, discrimination and economic protectionism *per se* violates the Commerce Clause."). The district court held the Contraband Statutes not to be discriminatory and went on to hold that even under the second, *"Pike* balancing test" analysis any burden incidentally imposed by the Contraband Statutes was outweighed by the local benefits secured. Appellants' brief on appeal reiterates the claim of a "clear discrimination" form of Commerce Clause violation, *see, e.g.*, Appellants' Br. at 19 ("The Contraband Statute constitutes a virtually *per se* violation of the dormant Commerce Clause."); *id.* at 23 ("[T]he protectionist objective is facially apparent"), but does not propose that we engage in a *Pike* "incidental burdens" analysis. In their reply brief, appellants advance for the first time a claim of the third, "extraterritorial" form of Commerce Clause violation described above. *See* Appellants' Reply Br. at 7 (citing *Healy*, 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275).

unequal burden be shown, a reviewing court need not proceed further." *Id.*

The bottom line is therefore that, under either the "clear discrimination" or the "*Pike*" forms of analysis, "the minimum showing required ... is that [the state statute] have a disparate impact on interstate commerce." *Automated Salvage Trans.*, 155 F.3d at 75. Because the Contraband Statutes have no such disparate impact, either facially or in incidental effect, appellants' claim fails.

Appellants cannot and do not identify any in-state commercial interest that is favored, directly or indirectly, by the Contraband Statutes at the expense of out-of-state competitors. Appellants concede that "virtually all cigarettes sold at retail in New York are purchased out of state." Appellants' Reply Br. at 6. Moreover, the Contraband Statutes apply equally to the products of in-state and out-of-state manufacturers, and to products sold by and to in-state and out-of-state wholesalers, tax agents, and importers. Any " 'incidental' burdens," *Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), on products originating out-of-state—i.e., the so-called "[e]mbargoing" of the cigarettes of NPMs purchased by appellants, Appellants' Br. at 5—is a result of their failure to comply with the Escrow and Contraband Statutes, a burden that is no greater for out-of-state economic interests than for in-state ones.

To remedy this gap in their argument, appellants offer several novel theories. First, they propose that New York State itself is the "local" interest benefitted by the Contraband Statutes and that the goal of ensuring New York's receipt of the maximum revenue under the MSA constitutes a facially protectionist objective. However, there is simply no precedent to support the proposition that a state's generation of revenues at the expense of instate and out-of-state economic interests alike is, without more, invalidly protectionist for Commerce Clause purposes. Nor are there grounds to create such a precedent.

For dormant Commerce Clause purposes, the relevant "economic interests," both in-state and out-of-state, are parties using the stream of commerce, not those of the state itself. *See West Lynn Creamery*, 512 U.S. at 202, 114 S.Ct. 2205 (describing economic interests relevant to differential burden analysis as "any part of the stream of commerce—from wholesaler to retailer to consumer"); *id.* at 192, 114 S.Ct. 2205 (stating that the dormant Commerce Clause prohibits state regulations that "benefit in-state economic interests by burdening out-of-state *competitors*" (emphasis added)). Were the Contraband Statutes directed solely at out-of-state economic interests, *see Guy v. Baltimore*, 100 U.S. 434, 443, 25 L.Ed. 743 (1880) (invalidating a Maryland wharfage fee regulation that imposed fees only on cargo not produced in Maryland), or in-state economic interests exempted from the Contraband Statutes' requirements, *see Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 273, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (invalidating a Hawaii statute that favored local producers by granting a tax exemption on certain liquors produced in Hawaii), or the MSA revenues used to subsidize local economic interests in competition with out-of-state economic interests subjected to the Contraband Statutes, *see West Lynn Creamery*, 512 U.S. at 194–95, 114 S.Ct. 2205 (invalidating a Massachusetts statutory scheme that imposed a uniform tax on milk sales and then used the proceeds of that tax to subsidize Massachusetts milk producers), appellants might be able to state a valid claim. However, the Contraband Statutes do none of these things.

Second, appellants propose that the PMs—although located out-of-state—are a

"local" interest benefitted by the Contraband Statutes, and that the goal of protecting their New York market share constitutes a facially protectionist objective. Appellants' Br. at 30. Appellants rely upon the following passage—that does not say what they claim—from the Supreme Court's opinion in *Bacchus Imports* to support this odd contention:

> The State does not seriously defend the Hawaii Supreme Court's conclusion that because there was no discrimination between in-state and out-of-state *taxpayers* there was no Commerce Clause violation. Our cases make clear that discrimination between in-state and out-of-state goods is as offensive to the Commerce Clause as discrimination between in-state and out-of-state taxpayers.

*Bacchus Imports*, 468 U.S. at 268 n. 8, 104 S.Ct. 3049 (emphasis in original). In fact, the quoted passage stands only for the proposition that disparate treatment of in-state and out-of-state manufacturers (i.e., "goods") is just as much a violation of the Commerce Clause as disparate treatment of in-state and out-of-state consumers (i.e., "taxpayers"). To be prohibited, a statute still must favor an in-state commercial interest over a corresponding out-of-state commercial interest, an element absent in the present matter. *See Or. Waste Sys., Inc.*, 511 U.S. at 100, 114 S.Ct. 1345 (invalidating Oregon statute that favored shippers of "Oregon waste" over shippers of waste from "other States"); *West Lynn Creamery*, 512 U.S. at 192, 114 S.Ct. 2205 (requiring benefit to "in-state economic interests" and burden to "out-of-state" interests); *United Haulers Ass'n v. Oneida–Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 262 (2d Cir.2001) (upholding statute where burden imposed "does not fall more heavily on out-of-state concerns than on local ones").

Thus, the Contraband Statutes are not "clearly discriminatory," and, under the *Pike* balancing test, do not impose "unequal burdens" on interstate and intrastate commerce. As such, we "need not proceed further." *Nat'l Elec. Mfrs.*, 272 F.3d at 109.

### 2. *Extraterritoriality Analysis*

In their reply brief, appellants rely upon a line of Supreme Court price-regulation cases to argue that the Contraband Statutes violate the dormant Commerce Clause by regulating commerce occurring wholly outside the borders of New York. *See* Appellants' Rep. Br. at 7 (citing *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521, 55 S.Ct. 497, 79 L.Ed. 1032 (1935); *Healy*, 491 U.S. at 336, 109 S.Ct. 2491; *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 583–84, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)). Even assuming that appellants have properly preserved this argument below and raised it on appeal, *see* Note 12, *supra*, it is without merit.

As noted, a state statute will be invalid *per se* under the Commerce Clause if it has the practical effect of controlling commerce occurring wholly outside that State's borders. *Healy*, 491 U.S. at 332, 109 S.Ct. 2491. In *Healy*, the Supreme Court described in detail how to assess a statute's constitutionality under the "extraterritoriality" branch of dormant Commerce Clause analysis as follows:

> First, the Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State, and, specifically, a State may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states. Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the

enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State.

*Id.* at 336–37, 109 S.Ct. 2491 (internal quotation marks, citations and footnotes omitted).[13]

Appellants claim that the "artificially high prices" fostered by the Contraband Statutes "inflate[ ]" the prices charged by cigarette manufacturers to purchasers in sales transactions that occur wholly outside the State of New York. Appellants' Reply Br. at 6. Thus, appellants argue, the Contraband Statutes are regulating out-of-state commerce in the sense that, in an out-of-state transaction, "[a] purchaser of . . . product bought for resale at retail in New York either pays the price set by the Cartel or forfeits the right to ship ciga-

rettes for sale at retail into the State of New York." *Id.* Appellants argue that this extraterritorial effect renders the Contraband Statutes *per se* invalid under the dormant Commerce Clause. *Id.* at 7.

Even assuming for present purposes that appellants' characterization of the Contraband Statutes' effect is accurate, the "practical effect" of the Contraband Statutes on extraterritorial commerce does not rise to the level of a constitutionally impermissible act. The effect does not constitute the "regulati[on of] commerce," *Healy*, 491 U.S. at 332, 109 S.Ct. 2491, "control[ of] commerce," *id.* at 336, 109 S.Ct. 2491, "projection of one state regulatory regime into the jurisdiction of another State," *id.* at 337, 109 S.Ct. 2491, or "application of a state statute to [extraterritorial] commerce," *id.* at 336, 109 S.Ct. 2491, necessary to render a state statute invalid.

The extraterritorial effect described by appellants amounts to no more than the upstream pricing impact of a state regulation. Because cigarettes sold at retail must have been produced only by manufacturers in certified compliance with New York's Escrow Statute, importers such as appellants must buy more expensive, "certified" cigarettes (in their out-of-state transactions) if they wish to sell to New York retailers. However, a similar pricing impact might result from any state regulation of a product, and "[t]he mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within

---

**13.** In this context, little danger of "inconsistent legislation" exists. In fact, a universal and practically uniform national system of payments by tobacco companies to states has been created. As noted, all of the Settling States have enacted the form Escrow Statute, *see* Compl. ¶ 19, at 10, and 24 have passed Contraband Statutes, *see* Appellants' Rule 28(j) letter. Furthermore, each of the four states that did not join the MSA—Florida, Minnesota, Mississippi and Texas—settled in-

dividually with the major tobacco companies. *See State v. Philip Morris,* 179 Misc.2d at 439–40 n. 3, 686 N.Y.S.2d 564. These individual settlements were similar to the MSA; for example, in approving New York's participation in the MSA, the New York County Supreme Court stated that "[t]he MSA for New York contains every single public health provision found in the Minnesota settlement." *Id.* at 444, 686 N.Y.S.2d 564.

that domain which the Constitution forbids." *Osborn v. Ozlin,* 310 U.S. 53, 62, 60 S.Ct. 758, 84 L.Ed. 1074 (1940); *see also Healy,* 491 U.S. at 345, 109 S.Ct. 2491 (Scalia, J., concurring in part and concurring in the judgment) (noting that "innumerable valid state laws affect pricing decisions in other States," and cautioning against allowing Commerce Clause jurisprudence to "degenerate into disputes over degree of economic effect"). While the out-of-state wholesale prices of cigarettes may be affected by the Contraband Statutes, therefore, out-of-state actors such as appellants remain free to conduct commerce on their own terms, without either scrutiny or control by New York State.

By contrast, in the Supreme Court cases relied upon by appellants, *Seelig,*[14] *Brown–Forman,*[15] and *Healy,*[16] the Court struck down state statutes that went a step further, controlling in-state and out-of-state pricing of goods going into the state. These statutes did so by making specific reference to the terms of such pricing—

terms which burdened out-of-state actors more than in-state actors—and attaching in-state consequences where the pricing terms violated the statutes. Unlike the statutes at issue in *Seelig, Brown–Forman,* and *Healy,* the Contraband Statutes impose no such out-of-state burden and therefore cannot be said either to regulate prices or otherwise to control the terms of out-of-state transactions.

Finally, appellants have not alleged that the Contraband Statutes are inconsistent with the legitimate regulatory regimes of other states, *see Healy,* 491 U.S. at 336–37, 109 S.Ct. 2491, that the Contraband Statutes force out-of-state merchants to seek New York regulatory approval before undertaking an out-of-state transaction, *see id.* at 337, 109 S.Ct. 2491, or that any sort of interstate regulatory gridlock would occur if "many or every" state adopted similar legislation, *see id.* at 336, 339–40, 109 S.Ct. 2491. In short, none of the indicia of an impermissible extraterritorial regulation are present.

**14.** In *Seelig,* the Supreme Court struck down a New York statute that (a) established in-state minimum wholesale milk prices, and (b) banned the resale in New York of milk purchased out-of-state at wholesale prices below in-state minimums. *Seelig,* 294 U.S. at 519, 55 S.Ct. 497. The Court found that the statute's effect was to set minimum out-of-state wholesale milk prices, stating:

> It is one thing for a state to exact adherence by an importer to fitting standards of sanitation before the products of the farm or factory may be sold in its markets. It is a very different thing to establish a wage scale or a scale of prices for use in other states, and to bar the sale of the products, whether in the original packages or in others, unless the scale has been observed.

*Id.* at 528, 55 S.Ct. 497.

**15.** In *Brown–Forman,* the Supreme Court struck down a New York statute that required liquor distillers to certify that their in-state prices were no higher than the lowest price at which the same product would be sold out-of-state during the month. *Brown–Forman,* 476

U.S. at 575–76, 106 S.Ct. 2080. The Court noted that, under the statute, "[o]nce a distiller has posted prices in New York, it is not free to change its prices elsewhere in the United States during the relevant month. Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce." *Id.* at 582, 106 S.Ct. 2080 (footnote omitted).

**16.** In *Healy,* the Supreme Court struck down a Connecticut statute that required out-of-state beer importers to certify that the prices at which the products were sold to Connecticut wholesalers were no higher than prices at which those same products were sold in bordering states. *Healy,* 491 U.S. at 326, 109 S.Ct. 2491. The Court held the statute to be unconstitutional because it had the effect of controlling prices in neighboring states, thereby interfering with those states' regulatory schemes and because it discriminated against those brewers and shippers of beer who were engaged in interstate commerce. *Id.* at 337–40, 109 S.Ct. 2491.

b) *Sherman Act Claim*

Appellants' complaint alleges that the Contraband Statutes are "an implementation illegal *per se* under § 1 of the Sherman Act of an output cartel, [are] in direct conflict with that law and [are], accordingly, preempted by that Act." Compl. ¶ 2, at 3. The district court dismissed this claim on the sole ground that the Contraband Statutes are "immune from antitrust prosecution, because they represent a unilateral state action, not prohibited under the Sherman Act." *Freedom Holdings, Inc. v. Spitzer*, No. 02 CIV 2929, tr. at 45 (S.D.N.Y. May 14, 2002) (oral findings and conclusions) (citing *Parker*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315). The court further noted that, in its view, "New York was not seeking to create any benefit to the cigarette manufacturing companies .... New York was dealing, as [were] the other states, in a very important local health interest. It enacted legislation that it considered appropriate to remedy these interests. That's the very thing that *Parker v. Brown* immunizes." *Id.* at 49.

1. *Preemption Analysis*

The Sherman Act embodies a federal policy prohibiting anticompetitive conduct by private firms. Under the Supremacy Clause, of course, the power of states to adopt policies that conflict with federal law is limited. In the context of the Sherman Act, the use of the Supremacy Clause to preempt a state law that limits competition among private firms is complicated by the fact that state police powers and regulatory authority have traditionally been thought to extend legitimately to a range of anticompetitive schemes. No one seriously argues, therefore, that the Sherman Act was intended to preempt all such regulation. On the other hand, "[t]he national policy in favor of competition cannot be thwarted by casting ... a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *Cal.*

*Ret'l Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 106, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). Viewing state regulation on a spectrum, at one end is state utility regulation, which in its usual form combines a state-protected monopoly with rate regulation and is not subject to preemption. *See Bedell*, 263 F.3d at 255. At the other end is a state law that purports to legalize price-fixing by private firms for no stated purpose other than protecting the private price-fixers from competition. Such a law is subject to preemption. *See Parker*, 317 U.S. at 351, 63 S.Ct. 307. Whether state statutory schemes on this spectrum are preempted depends on both the state policy goals and the regulatory means applied. We defer discussion of the legal ramifications of particular goals and means to part (b)(3) of this section of our opinion.

 Whether a state statute that restrains competition among private firms is preempted by the Sherman Act is determined by a two-step analysis. The plaintiff must first show that the scheme of market control created by the statute would constitute a *per se* violation of the Sherman Act if brought about by an agreement among private parties. A statute will be preempted by the Sherman Act only if it "mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." *Fisher v. Berkeley*, 475 U.S. 260, 265, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986) (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 661, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982); *Battipaglia v. N.Y. State Liquor Auth.*, 745 F.2d 166, 174 (2d Cir.1984) (quoting *Rice*, 458 U.S. at 661, 102 S.Ct. 3294)); *see also 324 Liquor Corp. v. Duffy*, 479 U.S. 335, 341, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987) (describing the "threshold question"

as whether the state statute is inconsistent with the antitrust laws); *Midcal,* 445 U.S. at 102, 100 S.Ct. 937 (1980) (same). For a statute to be preempted, the conduct contemplated by the statute must be "in all cases a *per se* violation" of the federal antitrust laws. *Battipaglia,* 745 F.2d at 174 (quoting *Rice,* 458 U.S. at 661, 102 S.Ct. 3294).

■■■ Even if a *per se* violation is shown, the alleged anticompetitive scheme may still be immunized under the *Parker* state action doctrine only where it regulates commerce in furtherance of legitimate state policy goals and limits unnecessary anticompetitive effects. A statute that permits or compels private parties to engage in *per se* violations of the federal antitrust laws will be saved from preemption if: (i) the restraint in question is "clearly articulated and affirmatively expressed as state policy," and (ii) the policy is "actively supervised" by the state itself. *Midcal,* 445 U.S. at 105, 100 S.Ct. 937 (quoting *City of Lafayette v. La. Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)).

We address these analytic steps in turn.

### 2. *Per Se Violation*

As noted, the first question is whether the scheme alleged to have been created by the Contraband Statutes would constitute a *per se* violation of federal antitrust law if brought about by an agreement among private parties.

### (i) *Unilateral Act of State*

Appellees argue that appellants cannot meet this test because a *per se* violation requires, in the language of the Sherman

Act itself, a private "contract, combination, or conspiracy" to restrain trade and that what is challenged here is a "unilateral act" of government rather than a "contract, combination, or conspiracy." Appellees' Br. at 39. This argument ignores both applicable Supreme Court caselaw and the relationship of the Contraband Statutes to the MSA as alleged in the complaint.

■■■ First, the unilateral act of a state government protecting private parties from competition can be preempted by the Sherman Act. Where the anticompetitive effects of a state statute obviate the need for private parties to act on their own to create an anticompetitive scheme, the statute may be attacked as a "hybrid" restraint on trade. In *324 Liquor,* the Supreme Court held:

> Where "private actors are granted a degree of private regulatory power [by a state] the regulatory scheme may be attacked under § 1" as a "hybrid" restraint.... [T]he federal antitrust laws pre-empt state laws authorizing or compelling private parties to engage in anticompetitive behavior.

*324 Liquor,* 479 U.S. at 345–46 n. 8, 107 S.Ct. 720 (some internal quotation marks and ellipses omitted) (quoting *Fisher v. Berkeley,* 475 U.S. 260, 268, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986) (quoting *Rice v. Norman Williams Co.,* 458 U.S. 654, 666, n. 1, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982) (Stevens, J., concurring in the judgment))). In rejecting the position taken by appellees, namely that a private "contract, combination, or conspiracy" must be shown to support a Sherman Act preemption claim,[17] the Court stated that the federal

---

17. Appellees rely upon our decision in *Battipaglia v. New York State Liquor Authority,* 745 F.2d 166 (2d Cir.1984), which stated that in that case "plaintiffs have been faced from the outset with the difficulty that the challenged provisions of the [state statute] do not compel

any agreement," *id.* at 170, to support their argument that a private "contract, combination, or conspiracy" must be shown for Sherman Act preemption to occur. However, *Battipaglia* actually noted diverging lines of authority on the question of whether a show-

# 224

antitrust laws may preempt state laws that authorize or compel private parties to engage in anticompetitive behavior. *See id.*

Second, *324 Liquor* itself invalidated a statute that was far more "unilateral" than the scheme alleged here. *324 Liquor* involved a New York law that required liquor retailers to charge 112% of wholesalers' posted bottle prices where that posting of prices was also required by New York law. 479 U.S. at 337–39, 107 S.Ct. 720. The only private acts involved were the individual determinations of each wholesaler as to what bottle price to post. *Id.* at 337–40, 107 S.Ct. 720.

By sharp contrast, the Contraband Statutes allegedly enforce an express market-sharing agreement among private tobacco manufacturers, the MSA. As alleged in the complaint, the Contraband Statutes are the result of the incentives created by the MSA for the States, here New York, to pass legislation that would prevent NPM Adjustments caused by price competition from diminishing revenue to the State.[18] The MSA was an agreement involving the State of New York, but it also was by any definition a "contract" that the four major tobacco manufacturers jointly negotiated among themselves (and for which they unsuccessfully sought an antitrust exemption from the Congress [19]) and with the states, and that other smaller manufacturers subsequently joined. The parties to the MSA are alleged in the complaint to constitute horizontal competitors originally controlling 99% of the market. Even if a "contract" among private parties is required in the first step of preemption analysis, therefore, it exists in the present matter.[20]

ing of a private agreement is necessary for preemption, and ultimately declined to "resolve that difficult question." *Id.* at 173. The majority did not reach the question because it held that the anticompetitive acts at issue in that case—the exchange of price information—would constitute only a rule-of-reason restraint rather than a *per se* restraint. *Id.* at 174–75 (citing *Rice v. Norman Williams Co.*, 458 U.S. 654, 659–62, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982)). In any event, since our decision in *Battipaglia,* the Supreme Court has made it clear that an actual "contract, combination or conspiracy" need not be shown for a state statute to be preempted by the Sherman Act. *324 Liquor,* 479 U.S. at 345–46 n. 8, 107 S.Ct. 720.

18. Appellees claim that appellants, while challenging the Contraband Statutes, have conceded the validity of the MSA and the Escrow Statute under the Sherman Act. *See* Appellees' Br. at 38. No such concession has been made. Indeed, it is clearly alleged that the Contraband Statutes are anticompetitive precisely because they implement the cartel established by the MSA. Appellants do not challenge the MSA directly because it is the Contraband Statutes, not the MSA standing alone, that injures them.

19. The proposed exemption, part of a bill sponsored by Senator McCain and introduced on November 7, 1997, read as follows: "Antitrust Exemptions.-The provisions of the Sherman Act (15 U.S.C. 1 *et seq.*), the Clayton Act (29 U.S.C. 52 *et seq.*), and any other federal or state antitrust laws shall not apply to an association or organization to which subsection (B) applies." Universal Tobacco Settlement Act, S. 1415, 105th Cong. § 155(D) (1997). Subsection (B) applied to tobacco industry trade organizations or other associations that met certain requirements for "independent" boards and bylaws. *Id.* at § 155(B). According to testimony at a Senate hearing, a broader antitrust immunity provision was also considered, which read as follows: "In order to achieve the goals of this agreement and the Act relating to tobacco use by children and adolescents, the tobacco product manufacturers may, notwithstanding the provisions of the Sherman Act, the Clayton Act, or any other federal or state antitrust law, jointly confer, coordinate, or act in concert, for this limited purpose." *Tobacco Settlement: Hearing Before the Senate Comm. on Commerce, Sci. and Transp.,* 105th Cong. (1998) (LEXIS, National Narrowcast Network) (statement of Robert Pitofsky, Chairman, Federal Trade Commission). This provision, however, does not appear in any version of the legislation available on lexis.com.

20. Appellees suggest in a footnote that the state action immunity turns upon whether the

### (ii) *The Allegations of the Complaint*

■ We turn then to the question whether the behavior alleged to be authorized or compelled by the Contraband Statutes (i.e., enforcement of the alleged output cartel) would be a *per se* Sherman Act violation if done by private agreement. *See generally* 1 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 217b2, at 306–07 (2d ed.2000).

■ Horizontal agreements among competing sellers to fix prices or restrict output are, absent more, *per se* violations of Section 1 of the Sherman Act. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 100, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal *per se*' approach because the probability that these practices are anticompetitive is so high; a *per se* rule is applied when 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.'" (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979))); *Bedell*, 263 F.3d at 247 ("An agreement which has the purpose and effect of reducing output is illegal under § 1 of the Sherman Act."); *see also Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594–95 (7th Cir.1984) ("[W]ith exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects."), *quoted in Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 777, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999); *United States v. An-*

*dreas*, 39 F.Supp.2d 1048, 1060 (N.D.Ill. 1998) ("Direct price agreements and sales volume are two sides to the same price-fixing coin.").

Appellants have alleged in detail that the MSA/Contraband Statutes scheme involves both market division and price-fixing. As alleged, the MSA was agreed to by horizontal competitors who originally controlled 99% of the market for cigarettes and created substantial disincentives for any PM to attempt to increase its market share through price competition. These disincentives are found in the MSA's various provisions requiring that increased payment obligations accompany increased market share. Because market-share increases among manufacturers are substantially "penalized," *see* note 5, *supra*, Compl. ¶ 17, at 9, appellants allege that the OPMs, as market share leaders, have the discretion to increase prices—at least until higher prices would reduce profits—assured that competitors will follow their price lead so as to avoid picking up new market share, profits from which will be offset by required payments to the Settling States. As the Third Circuit observed in *Bedell*:

> [I]t is clear the [MSA] empowers the tobacco companies to make anticompetitive decisions with no regulatory oversight by the States. Specifically, the defendants are free to fix and raise prices, allegedly without fear of competition.

*Bedell*, 263 F.3d at 260; *see also id.* at 246 (citing plaintiffs' allegations that the four majors could have funded the settlement agreement with a $0.19 per pack increase in price, but that the majors immediately

---

defendants in the action are private parties or state officials. *See* Appellees' Br. at 42–43 n. 13. We disagree. If a state statute is preempted, state officials may be prevented from enforcing it. In fact, in *324 Liquor*, the members of the New York State Liquor Authority were parties to the action and were prevented

from enforcing the law challenged there. The only distinction between *324 Liquor* and the present case is that, in *324 Liquor*, the state officials initiated the action. *See* Brief for Appellants, *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987) (No. 84–2022).

raised prices by $0.45 per pack, and subsequently by another $0.31 per pack). The scheme as alleged also involves market division and price-fixing enforced against NPMs by wholesalers refusing to deal with them because of the provisions of the Contraband Statutes. In short, plaintiffs allege that the combination of the MSA, the Escrow Statutes, and the Contraband Statutes, allows OPMs to set supracompetitive prices that effectively cause other manufacturers either to charge similar prices or to cease selling. Compl. ¶¶ 2, 13, 17, 20, at 2–11. NPMs are forced to charge these prices to cover the costs imposed by the Escrow and Contraband Statutes or go out of business in New York.

The alleged arrangement, even without the protection of the Contraband Statutes as enforced by wholesalers, would be a *per se* violation because it is a naked restraint on competition, albeit one subject to erosion by NPMs. *See* 11 Herbert Hovenkamp, *Antitrust Law*, ¶ 1910, at 252–65 (1998) (*per se* illegality for "naked" restraints.) With the Contraband Statutes in force, the scheme as alleged threatens to become a permanent, nationwide cartel, *see* note 13, *supra.*

Had the executives of the major tobacco companies entered into such an arrangement without the involvement of the States and their attorneys general, those executives would long ago have had depressing conversations with their attorneys about the United States Sentencing Guidelines. *See* U.S.S.G. § 2R1.1 (Antitrust Offenses). We therefore hold that appellants have sufficiently alleged a *per se* violation of the Sherman Act.

### 3. *State Action Immunity*

■ We now turn to the question of whether the statute is saved from preemption under *Parker v. Brown.* As noted, *Parker* preserves the ability of states to promulgate anticompetitive regulations in furtherance of legitimate state policy goals. *See Parker,* 317 U.S. at 350–51, 63 S.Ct. 307 (declining to attribute to Congress's enactment of the Sherman Act "an unexpressed purpose to nullify a state's control over its officers and agents"); 1 Areeda & Hovenkamp, *supra,* ¶ 217d, at 316–17. A common example is state protection and regulation of monopolies that provide services such as electric power. *See Bedell,* 263 F.3d at 255. However, as *Parker* noted, a state cannot simply "give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Parker,* 317 U.S. at 351, 63 S.Ct. 307. Rather, as *Midcal* made explicit, the state must substitute its own policy objectives and regulatory oversight for the federal antitrust policy and enforcement mechanisms displaced by the state legislation. That is, if a state statute mandates or authorizes *per se* violations of the antitrust laws, it will be saved from preemption only if (i) the restraint in question is "clearly articulated and affirmatively expressed as state policy," and (ii) the policy is "actively supervised" by the State itself. *Midcal,* 445 U.S. at 105, 100 S.Ct. 937 (quoting *City of Lafayette,* 435 U.S. at 410, 98 S.Ct. 1123).

#### (i) *Clear Articulation and Affirmative Expression*

We turn then to the first prong of the *Midcal* analysis, whether the anticompetitive restraint alleged—the output cartel— has been "clearly articulated and affirmatively expressed as state policy." We are somewhat disadvantaged in discussing this question because the district court never addressed it and the parties' briefs have not joined issue on it. Appellants found no need to dwell on the issue because the second *Midcal* requirement—state oversight of the pricing conduct of the tobacco

firms protected by the Contraband Statutes—is obviously not met. Appellees in turn have been content to rest their case essentially on the "unilateral act" argument rejected above and on conclusory references to claimed health care benefits resulting from the MSA.

### (A) *Express Adoption of an Anticompetitive Scheme*

One purpose of the first *Midcal* prong is to ensure that state action immunity is afforded only to actions taken by the state. Most assuredly, agreement to the MSA by the New York Attorney General,[21] approval of it by a New York court, and passage of the Contraband Statutes were express acts of the State of New York. This purpose of the first *Midcal* prong is therefore satisfied. *See Cine 42nd St. Theater Corp. v. Nederlander Org.,* 790 F.2d 1032, 1042 (2d Cir.1986).

### (B) *State Policy Goals*

However, there is an ancillary purpose of this *Midcal* prong, which in this case is to reveal the State's purposes in agreeing to, and enforcing, the MSA's market-share provisions. These purposes must be known to ensure that the State's policy goals are sufficient to qualify for the *Par-*

*ker* immunity—simply protecting private parties from competition is not a sufficient goal, *see Parker,* 317 U.S. at 351–52, 63 S.Ct. 307. Of course, if the purposes are not of the kind that would trigger *Parker* analysis, we generally would deny the immunity on *Parker* grounds rather than on a failure to satisfy the first *Midcal* prong. Indeed, it is doubtful that a federal court would upset a state statute solely because it failed to meet the explanatory aspect of the first *Midcal* prong if it passed muster in all other respects. Nevertheless, that prong does implicate the purposes of the State, and we accordingly discuss the enunciated goals of the Contraband Statutes and MSA here.

On the record before us, the statement closest to articulating the State's interest is Governor Pataki's memorandum urging passage of the Contraband Statutes, which stated:

> The ... Master Settlement Agreement (MSA) requires downward adjustment in payments to states if it is determined that the MSA caused the participating manufacturers to lose aggregate market share to nonparticipating manufacturers (NPM's). States can protect themselves from NPM adjustments by enacting [an Escrow Statute], and "diligently enforcing" that law. Immediate enactment of

---

**21.** Appellees have not argued that because the MSA is a settlement of a lawsuit, it somehow achieves an immunity not otherwise available. Of course, such an argument would be fruitless. First, such an argument would negate appellees' claim that the requisite contract, combination or conspiracy is lacking. *See* "Unilateral Act of State," subsection (b)(2)(i), *supra.* Second, Sherman Act violations are generally not immunized because the anticompetitive scheme is embodied in the settlement of a lawsuit. *See United States v. Singer Mfg. Co.,* 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963) (holding that settlement agreements between the Singer Company and its Italian and Swiss competitors violated the Sherman Act); *Duplan Corp. v. Deering Mil-*

*liken, Inc.,* 594 F.2d 979, 981 (4th Cir.1979) (per curiam) (affirming district court's finding that settlement agreement "was the core of a scheme to stabilize and maintain production royalties ... and to monopolize the United States market."). Third, this result is not altered because a state attorney general has negotiated such an agreement. If the law were otherwise, a state attorney general would be able to do what *Midcal* and *324 Liquor* deny state legislatures by bringing a lawsuit and settling in an anticompetitive agreement. If the model of the MSA was followed, the state attorneys general might collectively establish a nationwide cartel. *See* note 13, *supra.*

the [Contraband Statutes] would substantially bolster the State's ability to diligently enforce the [Escrow Statute] and help protect the State from future [NPM] adjustments . . . .

Appellants' Br. at 18 (quoting Governor Pataki Memorandum of Oct. 29, 2001). While this statement admits the State's interest in the revenue from cigarette sales, it falls short of expressly stating why the market-share provisions are needed to effectuate state policy goals.

The Escrow Statute contains a "Findings and purpose" section, set out in full in the margin,[22] that notes: (i) the health dangers of cigarettes, (ii) the resultant health care costs to the State, (iii) the OPMs' obligation to pay substantial sums to the State, (iv) the fact that these payments are "tied in part to their volume of sales," and (v) the state's policy of preventing NPMs from using their cost advantage to reap greater profits while the State bears the resultant health care costs. However, this "Findings and purpose" section articulates no more than the conceded health concerns over cigarettes, a settlement that includes a levy on every cigarette sold by the OPMs, and a need to force NPMs to pay a similar amount.

Also, appellees assert in their brief, but without elaboration, that the MSA's market-share provisions are designed "to ensure that MSA payments per cigarette remain essentially constant regardless of whether sales increase or decrease," Appellees' Br. at 11, and that the payment obligations of the MSA do nothing other

---

**22.** Section 1399–nn states:

Findings and purpose

1. Cigarette smoking presents serious public health concerns to the state and to the citizens of the state. The Surgeon General has determined that smoking causes lung cancer, heart disease and other serious diseases, and that there are hundreds of thousands of tobacco-related deaths in the United States each year. These diseases most often do not appear until many years after the person in question begins smoking.

2. Cigarette smoking also presents serious financial concerns for the state. Under certain health-care programs, the state may have a legal obligation to provide medical assistance to eligible persons for health conditions associated with cigarette smoking, and those persons may have a legal entitlement to receive such medical assistance.

3. Under these programs, the state pays millions of dollars each year to provide medical assistance for these persons for health conditions associated with cigarette smoking.

4. It is the policy of the state that financial burdens imposed on the state by cigarette smoking be borne by tobacco product manufacturers rather than by the state to the extent that such manufacturers either determine to enter into a settlement with the state or are found culpable by the courts.

5. On November twenty-third, nineteen hundred ninety-eight, leading United States tobacco product manufacturers entered into a settlement agreement, entitled the "Master Settlement Agreement," with the state. The master settlement agreement obligates these manufacturers, in return for a release of past, present and certain future claims against them as described therein, to pay substantial sums to the state (tied in part to their volume of sales); to fund a national foundation devoted to the interests of public health; and to make substantial changes in their advertising and marketing practices and corporate culture, with the intention of reducing underage smoking.

6. It would be contrary to the policy of the state if tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the state will have an eventual source of recovery from them if they are proven to have acted culpably. It is thus in the interest of the state to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise.

N.Y. Pub. Health Law § 1399–nn (2002).

than "protect the State from having to bear the costs of an inherently deadly product," *id.* at 44.

Appellee's arguments therefore equate the MSA's market-share provisions with a flat tax levied on every cigarette sold. Indeed, a flat levy would accomplish the purposes set out in the Escrow Statute and appellees' brief, without anticompetitive effects and without creating any conflict with the Sherman Act.[23] A flat levy on every cigarette sold would not prevent price competition among cigarette manufacturers whereas the scheme alleged by appellants involves: (i) adjustments based on a particular manufacturer's market share as well as total volume, (ii) trebled decreases in payments under the NPM Adjustment, (iii) immunity from NPM Adjustments for Settling States that pass Escrow Statutes and "diligently enforce" them through Contraband Statutes, (iv) alleged disincentives for SPMs to increase market share, and (v) differential tax effects of the Escrow and Contraband Statutes on NPMs, all of which are alleged to constitute an output cartel in which the State shares profits. We are not second-guessing the State's choice of means to a policy goal. We are simply noting the fact that the State denies any anti-competitive effect and offers no explanation for the anti-competitive scheme that is alleged and challenged by appellants.

We note in that regard that it is questionable whether *Parker* immunity extends to a cartel arrangement supported by a state solely to allow the state to share the monopoly profits as state revenue, perhaps implied as the goal of the Contraband Statutes in Governor Pataki's statement quoted above. States may not shield private parties from competition solely to benefit those parties. The conflict with the Sherman Act is arguably not lessened by the fact that the private parties pay the state a share of their monopoly revenues for that protection. A state is quite able to raise revenue by taxing private parties who compete for the favor of consumers.

The failure of the State to elaborate a rationale[24]—competitive or anti-competitive—for the market-share provisions is echoed in the district court's decision and in appellees' brief. The district court, in upholding the Contraband Statutes, stated in conclusory fashion only that "New York was not seeking to create any benefit to the cigarette manufacturing companies . . . [but] was dealing . . . in a very important local health interest." *Freedom Holdings,* tr. at 49. Appellees' brief also resolutely denies any anticompetitive intent or effect and emphasizes public health benefits from the MSA, but only in conclusory terms.

A court might infer from the MSA and accompanying statutes themselves that they are thought to serve both public health and revenue enhancing purposes of

**23.** *See Antitrust Implications of the Global Tobacco Settlement: Hearing Before the Senate Comm. on the Judiciary,* 105th Cong. (1997) (LEXIS, National Narrowcast Network) (statement of Robert Pitofsky, Chairman, Federal Trade Commission) ("The arguments that I've heard as to why this kind of exemption is necessary are as follows: One, that it's important to ensure that the annual payments, that could amount to $15 billion a year in five or six years, be passed along in the form of higher prices. But one has to ask the question: Why do you need an antitrust exemption to do that? If the excise taxes go up or have

gone up in the past, there are studies that show they've been passed along to consumers. If the price of paper or tobacco went up in an industry like this, wouldn't we expect that the increased costs would be passed along to consumers? An exception of this kind would be most unusual, it could be construed to allow a kind of price fixing that I think we would not be comfortable with, and therefore I just can't see a justification along that line.").

**24.** We of course do not foreclose the State from offering a rationale for the market-share scheme in subsequent proceedings.

the State, although the State offers *no reason* why it used methods suppressing competition rather than a flat tax to achieve the same result. As discussed above, it is doubtful, although we do not decide the issue, that a State may shelter private parties from the Sherman Act solely in order to share monopoly profits. Moreover, at this stage in the proceeding and given the allegations of the complaint, the goals of serving public health and enhancing revenue conflict. That is to say, the fewer cigarettes sold, the less threat to public health, but also the less revenue raised by the State, and vice versa. Also, because the MSA requires the PMs to pay a fixed fee per cigarette but leaves them free to set whatever price they choose, the resolution of the price/sales/public health conflict is left by the MSA to the PMs, whose concern for public health, or for that matter State revenues, is not self-evident.

So far as we can tell, the principal public discussion of the effect of the market-share provisions of the MSA on competition took place when the major tobacco companies unsuccessfully sought from the Congress an exemption from the Sherman Act for the MSA. *See Tobacco Settlement: Hearing Before the Senate Comm. on Commerce, Sci. and Transp.*, 105th Cong. (1998) (LEXIS, National Narrowcast Network) (statement of Robert Pitofsky, Chairman, Federal Trade Commission) (The antitrust exemption "is vague, it's open ended, and in my opinion, it's largely unprecedented. We don't give industries exemptions from the antitrust laws, if we think the competitive system will work.

And it seems to me it certainly can work with respect to tobacco products. [An antitrust exemption] also could produce unfortunate consequences. One of the goals of the agreement is to raise the price of a pack of cigarettes, so as to discourage young people from smoking. This provision, as it reads here, says that the tobacco executives can get together in a room and agree on what the price of a pack of cigarettes is. It could be a price much higher than the cost of the annual payments. That seems to me not sensible. Now, the companies have come forward with a number of reasons why they say they need an antitrust exemption. They have to agree on what the payments are, if annual payments are required. Why do they have to agree? I mean, the payments will be required by law. All they have to do is obey the law.").

As noted, an ancillary function of the first *Midcal* prong is to establish the legitimate State policy underlying the decision to displace the Sherman Act. Absent such a policy, the Contraband Statutes would contravene *Parker*'s denial of state power to "give immunity [to the tobacco companies] by authorizing them to violate [the Sherman Act], or by declaring that their action is lawful." *Parker*, 317 U.S. at 351, 63 S.Ct. 307. Until now the State has relied in conclusory fashion on the claimed benefits to public health as a show stopper rendering further analysis or discussion irrelevant. It suffices to say here that, on the allegations of this complaint, the relationship of such benefits to the restraint on competition is not obvious [25] and may even

---

25. The principal health benefit from the arrangement as alleged appears to be that cigarette sales will be reduced by the higher prices that result from the cartel arrangement. However, because cigarettes are addictive, the demand for them is relatively inelastic, at least in the short run, and the health benefits from this aspect of the MSA have a ceiling. Moreover, given the broad police powers of the state to regulate the marketing of dangerous commodities, effective public health measures other than affording tobacco manufacturers a cartel are ubiquitous and far more obvious than the complex market-share arrangements of the MSA enforced by the Contraband Statutes. For example, if limiting sales of cigarettes by higher prices is chosen as a public health measure, a flat but high tax on each cigarette sold would alone

be counterproductive.[26]

#### (ii) *Active Supervision*

We turn now to the second *Midcal* prong, whether the alleged anticompetitive scheme is actively supervised by New York. We conclude that it is not. Neither the New York statutes, the MSA, nor any other New York law or regulation "actively supervise[s]" the pricing decisions within the allegedly-anticompetitive market structure enforced by the Contraband Statutes. Appellees' brief does not claim otherwise or even discuss the issue.

do the trick. Similarly, restrictions on marketing could be enacted.

**26.** Some of the Settling States may come to rely heavily on revenue from the MSA, as perhaps reflected in Governor Pataki's statement. *See also* Rick Hampson, *States Squander Chance to Help Fight Smoking*, USA Today, Mar. 11, 2003, at B1 (quoting Washington state attorney general's statement that "[t]he money in the tobacco settlement is as addictive to states as the nicotine in cigarettes is to smokers"); Gordon Fairclough and Vanessa O'Connell, *Co–Dependents: Once Tobacco Foes, States are Hooked on Settlement Cash*, Wall St. J., Apr. 2, 2003, at A1 (quoting R.J. Reynolds executive's statement that after the settlement, "the states make more money from each pack of cigarettes sold than anyone else"). Some Settling States may therefore have second thoughts about measures to reduce further the sale of cigarettes. In that regard, some Settling States have issued bonds that are secured by future tobacco revenue under the MSA but would become obligations of the particular States should tobacco revenues be insufficient. *See* Deborah Finestone, *Oregon Sells $428 Million Backed by Dual Security Pledge*, Bond Buyer, April 7, 2003, at 5; Christine Albano, *The Week Ahead: New York's $2.3B Tobacco Sale Seeks to Sublimate the Stain*, Bond Buyer, June 9, 2003, at 40. Further reductions in the sale of cigarettes might have very severe fiscal consequences for such States.

There are also increasing signs of alliances between the Settling States and the OPMs.

We are directed to no mechanism in the MSA or any of the related legislation whereby New York may "review[ ] the reasonableness" of the pricing decisions of tobacco manufacturers. *Midcal*, 445 U.S. at 105, 100 S.Ct. 937. Nor is there provision for New York to "monitor market conditions or engage in any 'pointed reexamination' of the program." *Id.* at 106, 100 S.Ct. 937. The PMs are therefore free to charge the profit maximizing price, the classic monopoly result.

We therefore agree with the Third Circuit in *Bedell*, which noted:

For example, 37 state and territorial attorneys general appeared as *amici* on behalf of a cigarette manufacturer's motion in an Illinois state court to reduce an appellate bond that might throw the company into bankruptcy. Brief of Amici Curiae Attorneys General, *Price v. Philip Morris, Inc.*, No. 00–L–112 (3d Cir. Ill. Apr. 2003) (unpublished decision); William McQuillen, *"Progress" in Philip Morris Lawsuit: US $12 Billion in Dispute*, National Post (Bloomberg), April 12, 2003, at FP7. Finally, in the wake of that incident and at the request of their attorneys general, 16 states have passed legislation capping the size of appeal bonds that can be required of corporations. *See, e.g.,* Va.Code Ann. § 8.01–676.1(J) (2003) (effective March 10, 2000) ("If the appellee in a civil action obtains a judgment for damages other than compensatory damages, or in excess of the compensatory damages, and the appellant seeks a stay of execution of the judgment in order to obtain review in the Court of Appeals or Supreme Court, the appeal bond or irrevocable letter of credit for the portion of the damages, other than the compensatory damages, or in excess of the compensatory damages, shall not exceed $ 25,000,000.") The bond-capping legislation in four of the Settling States is limited to corporations that are MSA PMs. *See, e.g.,* Nev. Rev.Stat. Ann. § 20.035(1) (2003) (effective May 29, 2001) ("[I]f an appeal is taken of a judgment in a civil action in which [a PM] is required to give a bond in order to secure a stay of execution of the judgment during the pendency of the appeal, the amount of the bond must not exceed $ 50,000,000."). *See also* Fairclough and O'Connell, *supra*.

[J]ust as the injury in *Midcal* was caused by private parties taking advantage of the state imposed market structure, the anticompetitive injury here resulted from the tobacco companies' conduct after implementation of the [MSA], and not from any further positive action by the States. Even though, as defendants argue, the [MSA] created the cartel, this fact makes the case analogous to *Midcal,* not different.

263 F.3d at 258, and then concluded:

> The States ... lack oversight or authority over the tobacco manufacturers' prices and production levels. These decisions are left entirely to the private actors. Nothing in the [MSA] or its [Escrow] Statutes gives the States authority to object if the tobacco companies raise their prices.

*Bedell,* 263 F.3d at 264.[27]

Therefore, under the present allegations, New York has failed to provide for any state supervision, much less active supervision, of the pricing conduct of cigarette manufacturers under the anticompetitive market structure created by the MSA and the Contraband Statutes. "Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." *Patrick v. Burget,* 486 U.S. 94, 101, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988). That leads us to conclude that the Contraband Statutes, were the allegations of the complaint proven, would not be saved by the *Parker* state action immunity.

As the Supreme Court stated in *324 Liquor,* the essence of the allegation is that "[t]he State has displaced competition ... without substituting an adequate system of regulation. 'The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement.'" 479 U.S. at 345, 107 S.Ct. 720 (quoting *Midcal,* 445 U.S. at 106, 100 S.Ct. 937).

### 4. *The Noerr–Pennington Immunity*

Finally, appellees claim that the Contraband Statutes are protected un-

---

**27.** In a replay of their argument rejected in subsection (b)(2)(i) of this section of the opinion, namely that *Parker* requires a private "contract, combination, or conspiracy" to satisfy the *per se* violation requirement and that unilateral acts of a state are immune, appellees argue that the active supervision requirement should not be applied in this case:

> Where challenged acts are those of private parties, as were the acts in *Bedell,* [the *Midcal* active supervision requirement will apply]. In contrast, acts of a State's legislature—like those that Plaintiffs have challenged here—are always immune under the state action doctrine. *Hoover v. Ronwin,* 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) ....

Appellees' Br. at 42 n. 13. This argument is clearly contrary to the decisions in *Midcal,* 445 U.S. at 105, 100 S.Ct. 937, and *324 Liquor,* 479 U.S. at 341–45, 107 S.Ct. 720.

Appellees' reliance upon *Hoover v. Ronwin,* 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984), is misplaced. That case held an allegedly anticompetitive Arizona bar admission program immune from antitrust challenge where, although the program was largely administered by a committee of private law practitioners, the practitioners were conceded to be "state officers" in carrying out their committee functions, and the Arizona Supreme Court nevertheless "retained strict supervisory powers and ultimate full authority" over the committee's actions. *Id.* at 572, 104 S.Ct. 1989. The Court did state in that case that legislative state action is *"ipso facto"* immune under federal antitrust law, *id.* at 568, 104 S.Ct. 1989, but that decision was in the context of anticompetitive conduct performed entirely by state actors, without any private involvement, and therefore effectively satisfied the *Midcal* supervision requirement. *See* 1 Areeda & Hovenkamp, *supra* ¶ 227, at 492.

der the *Noerr–Pennington* immunity. *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The *Noerr–Pennington* immunity is a First Amendment-based doctrine that protects private parties from liability under the Sherman Act in connection with efforts to petition for anticompetitive legislation. *See Bedell,* 263 F.3d at 250–51 (describing *Noerr–Pennington* as offering private parties immunity from antitrust liability arising from the act of petitioning or from government action which results from the petitioning). However, the immunity for advocacy cannot sensibly protect the resultant anticompetitive legislation from being held to be preempted as in conflict with the Sherman Act. Otherwise, all such legislation would be immune. *See* 1 Areeda & Hovenkamp, *supra,* ¶ 217a, at 301 ("[W]hen state law merely purports to authorize, or even compel, unsupervised private action of a kind that violates the antitrust laws, the state law is preempted by the force of federal law."). Here, appellants do not seek to impose liability on private defendants but rather seek to have the Contraband Statutes declared invalid and their enforcement enjoined.

Given *Noerr–Pennington*'s First Amendment concerns, and for obvious pragmatic reasons, the proper time at which to decide a preemption issue like the present one is not the pre-legislation advocacy stage. The end product of regulatory legislation can take many forms, some preempted, some not. Due to the indeterminate nature of the legislative process and the ambiguities inherent in political advocacy, a process that sought to prevent

advocacy of laws that might be subject to preemption would inevitably tread on advocacy of laws that are not. This does not, however, protect the ultimate legislative result from Supremacy Clause analysis. The *Noerr–Pennington* immunity, therefore, does not bar appellants' claims.

c) *Equal Protection Claim*

Appellants' selective enforcement claim is set out in part as follows:

> The defendants subject the sales of all cigarettes by importers or wholesalers to retailers within the State of New York to the terms of the [Contraband Statutes], *with the exception of sales by [wholesalers and importers]* [28] *located on Native American Reservations* situated within the State of New York.

Compl. ¶ 3, at 3. (emphasis added). Moreover, the complaint further alleges that defendants have "selectively enforce[d]" the Contraband Statutes so as to "economically favor [wholesalers and importers] on Native American Reservations situated in the State of New York," thereby "discriminating against plaintiffs and the other members of the class" in violation of the Equal Protection Clause. Compl. ¶¶ 44, 49, at 19, 20. Finally the complaint also presents the following question as a "question of law and fact" raised by its allegations:

> Does the defendants' consistent selective enforcement of the New York Contraband Statute in favor of direct buying [wholesalers and importers] on Native American Reservations situated within the State of New York, whereby the cigarettes those [wholesalers and importers] sell to any purchasers, including citizens and residents of the

---

**28.** Before the district court, appellants indicated that the term "retailers" should be replaced by "wholesalers and importers" for purposes of their Equal Protection claim. *See*

*Freedom Holdings,* tr. at 51. We have therefore deemed the appellants' complaint to be altered where such alternation is appropriate.

State of New York, [sic] constitute economic favoritism in favor of those Native American Reservation [wholesalers and importers] and discrimination against importers such as plaintiffs and the other members of the class in violation of ... the Equal Protection Clause ...?

Compl. ¶ 37(d), at 18.

■ To establish a violation of the Equal Protection Clause based on selective enforcement, a plaintiff must ordinarily show the following:

(1) [that] the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir.1999) (internal quotation marks and citations omitted). The district court essentially held that appellants could not establish the second element, an impermissible consideration. In that regard, it relied on *Washington v. Yakima Indian Nation*, 439 U.S. at 500–01, 99 S.Ct. 740 (finding that a legislative classification singling out tribal Indians was not "suspect," because of "the unique legal status of Indian tribes under federal law," and therefore employing rational basis review), and *New York Ass'n of Convenience Stores v. Urbach*, 92 N.Y.2d at 212–13, 677 N.Y.S.2d 280, 699 N.E.2d 904 (applying rational basis review to a New York State policy of not enforcing tax laws with respect to on-reservation cigarette sales). *See Freedom Holdings*, tr. at 51.

We have concluded that we should remand this claim for two reasons. First, the basis for the district court's reliance upon *Yakima Nation* and *Urbach* is unclear. These decisions deal with the exercise and non-exercise respectively of state jurisdiction on reservation land. In their brief and reply brief, appellants have made it clear that the alleged discriminatory failure of enforcement occurs only with respect to "shipments made from ... Reservations to New York wholesalers located outside of the Reservation." Appellants' Br. at 53; *see also* Appellants' Reply Br. at 24 ("Native American manufacturers, importers and wholesalers are free to make and sell cigarettes made by [NPMs] and ship them outside of the Reservation without being subjected to the forfeiture penalties of the Contraband Statute."). We do not therefore have the views of the district court on appellants' claim as presently framed. Because we are remanding for a second reason, we see no purpose in addressing this particular issue further on this appeal.

Second, under the rules of notice pleading, the complaint must contain allegations sufficient to alert the defendants to the nature of the claim and to allow them to defend against it. *See Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("[T]he Rules require [ ] 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.") (quoting Fed.R.Civ.P. 8(a)(2) (*quoted in Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002))). The present complaint fails to meet this test.

In particular the complaint fails to explain how, and at what stage of, the resale to "wholesalers located outside of the Reservation," Appellants. Br. at 53, the nonenforcement occurs. It is alleged that any off-reservation wholesaler or importer who purchases cigarettes is subject to enforcement of the Contraband Statutes. Because subsequent sales by wholesalers and importers of cigarettes purchased from wholesalers and importers on Native

American reservations are subject to the Contraband Statutes, these cigarettes would presumably bear the same tax and Escrow Statute certification burden borne by the cigarettes imported by appellants. Under the Contraband Statutes, such a wholesaler or importer would not be permitted to affix tax stamps without a manufacturer's certification of compliance with the Escrow Statute.[29]

In short, appellants fail to allege why the enforcement of the Contraband Statutes against off-reservation wholesalers and importers would not protect appellants from the competitive disadvantage of which they complain. Appellants make no allegations of any particular instances of enforcement or non-enforcement of the Contraband Statutes; they do not allege the means of non-enforcement, e.g., allowing sales without tax stamps, affixing tax stamps without certification, etc. At the same time, appellants have failed to identify any of the "[wholesalers and importers] located on Native American Reservations situated within the State of New York" whom they allege to have been favored by appellees, and they have not alleged that such wholesalers and importers are tobacco product manufacturers, cigarette tax stamp agents, or firms otherwise subject to the Contraband Statutes.

Appellees have therefore not been provided enough information to identify the basis for, or to defend against, appellants' claim. Under the circumstances, where the particular deficiencies that concern us were neither relied upon by the district court nor argued by appellees, appellants should be allowed a further opportunity to amend their complaint. *See Foman v. Davis,* 371 U.S. 178, 181–82, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of [ ] mere technicalities. 'The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.' " (quoting *Conley v. Gibson,* 355 U.S. at 48, 78 S.Ct. 99)).

We therefore remand the selective enforcement claim.

## CONCLUSION

For the foregoing reasons, we affirm the dismissal of the Commerce Clause claim, reverse with respect to the Sherman Act claim, and remand the Equal Protection claim for further proceedings.

SACK, Circuit Judge, concurring.

I concur. I write separately, however, to express some doubt about the majority's conclusion regarding the plaintiffs' claims under the Sherman Act.

The Supreme Court observed in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), that "[t]he Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action direct-

---

**29.** Appellants have not alleged otherwise. In their reply brief appellants conclusorily state that wholesalers "know" that cigarettes sold to them from reservations "have not been *and will not be* seized" under the Contraband Statutes. *See* Appellants' Reply Br. at 26 (emphasis added). However, appellants have made no allegations, in their complaint, in the proceedings below, or in their briefs, that, under appellees' enforcement program, ciga- rettes sold into New York from reservations have continued to be exempted from Contraband Statute enforcement from wholesaler to consumer. Appellants have alleged only that the Contraband Statutes are not enforced with respect to the initial sale—from the reservation to the wholesaler. *See* Compl. ¶ 3, at 3; *Freedom Holdings,* tr. at 51; Appellants' Br. at 53; Appellants' Reply Br. at 25.

ed by a state." *Id.* at 351, 63 S.Ct. 307. Therefore, "antitrust laws do not forbid the state from adopting policies that permit anticompetitive conduct by regulated private parties." *Cine 42nd St. Theater Corp. v. Nederlander Org., Inc.,* 790 F.2d 1032, 1042 (2d Cir.1986). While the Sherman Act preempts a state from "authorizing [private parties] to violate it, or . . . declaring that their action is lawful," *Parker,* 317 U.S. at 351, 63 S.Ct. 307, the Supreme Court has emphasized that "with the possible market participant exception, *any* action that qualifies as state action is *ipso facto* exempt from the operation of the antitrust laws," *City of Columbia v. Omni Outdoor Adver., Inc.,* 499 U.S. 365, 379, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (internal quotation marks and ellipsis omitted; emphasis in original).[1]

Where, as here, the alleged anticompetitive harm is achieved at least in part by the acts of private parties, a reviewing court must assure itself that the anticompetitive scheme is indeed that of the State itself. The court must "determine whether [the] anticompetitive conduct engaged in by private parties should be deemed state action and thus shielded from the antitrust laws." *Patrick v. Burget,* 486 U.S. 94, 100, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988). The Supreme Court has therefore created "two standards for [such] antitrust immunity under *Parker* . . . . First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy

must be 'actively supervised' by the State itself." *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

The first *Midcal* prong requires only that the state offer a "clear articulation of a state policy to authorize anticompetitive conduct." *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 40, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985).[2]

That part of the test seems easily met here, or at least seems as though it would be capable of proof before the district court on remand. In *A.D. Bedell Wholesale Co. v. Philip Morris Inc.,* 263 F.3d 239 (3d Cir.2001), the Third Circuit concluded, after a discussion of the issue, that "it is evident the Multistate Settlement Agreement was backed by clearly articulated state policy." *Id.* at 260 (footnote omitted). I generally agree with the Third Circuit on this point.

The "clear articulation" standard is not strict. The Supreme Court, in the course of reviewing a state statute delegating the state's authority to allow anticompetitive conduct to municipalities, noted that it has "rejected the contention that this requirement can be met only if the delegating statute explicitly permits the displacement of competition, *see* [*Town of Hallie,* 471 U.S. at 41–42, 105 S.Ct. 1713]. It is enough . . . if suppression of competition is the 'foreseeable result' of what the statute authorizes, *id.,* at 42, 105 S.Ct. 1713."

---

1. *Parker* does not permit a state to "becom[e] a participant in a private agreement . . . for restraint of trade," *id.* at 351–52, 63 S.Ct. 307, but the Supreme Court has made clear that this exception applies only when the state acts as a "commercial participant in a given market," not when it acts in its "regulatory capacity," *City of Columbia,* 499 U.S. at 374–75, 111 S.Ct. 1344.

2. Unlike the majority, I doubt that this test has "an ancillary purpose" of "reveal[ing] the

State's purposes in agreeing to, and enforcing, the MSA's market-share provisions." *Ante* at 227. The Supreme Court has made it clear, I think, that the first prong simply "requires authority to suppress competition." *City of Columbia,* 499 U.S. at 372, 111 S.Ct. 1344; *see also 324 Liquor Corp. v. Duffy,* 479 U.S. 335, 343–44, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987); *Town of Hallie,* 471 U.S. at 40–42, 105 S.Ct. 1713.

*City of Columbia*, 499 U.S. at 372–73, 111 S.Ct. 1344.

> [T]he Supreme Court [has] made clear that the first prong of the *Midcal* test is not as demanding as the Court's statement of it in *Midcal* suggests. It does not, for example, require a private party to show " 'a specific, detailed legislative authorization' for its challenged conduct." [*S. Motor Carriers Rate Conf., Inc. v. United States*, 471 U.S. 48, 64, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985)] (quoting *Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)). Rather, "[a]s long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the *Midcal* test is satisfied." *Motor Carriers*, 471 U.S. at 64, 105 S.Ct. 1721.

*Elec. Inspectors, Inc. v. Vill. of East Hills*, 320 F.3d 110, 124 (2d Cir.2003) (last brackets in original).

I see no reason not to apply this formulation to the case before us. And it seems to me that, thereunder, the "clear articulation" prong of the *Midcal* test can be or has been met inasmuch as the foreseeable—and likely foreseen—result of the challenged Contraband Statutes, combined with the operation of the associated statutes and the MSA, is the suppression of competition.

The second, "active supervision," prong of *Midcal* is the problem. The Third Circuit has pointed out that the MSA calls for active State supervision of the implementation of the MSA in the ordinary sense of the words "active supervision":

> The States actively and continually monitor the implementation of portions of the Multistate Settlement Agreement. After requiring a state court consent decree, the Multistate Settlement Agreement also mandates state courts to maintain continuing jurisdiction over enforcement of disputes between the States and the tobacco companies. Under the Multistate Settlement Agreement, the state courts may order compliance in the form of an Enforcement Order. If a State Attorney General believes a manufacturer has failed to comply with an Enforcement Order, it may seek an order for civil contempt or monetary sanction to force compliance. Furthermore, for a period of seven years after settlement, the Attorney General of a Settling State may inspect all non-privileged records of the tobacco companies, and will have access to interview directors, officers and employees upon reasonable belief of a violation of the Multistate Settlement Agreement.
>
> The Multistate Settlement Agreement also establishes a $50 million fund to assist the States in enforcing the Multistate Settlement Agreement. This fund is to be used
>
> > to supplement the States'
> >
> > > (1) enforcement and implementation of the terms of [the Multistate Settlement Agreement] and consent decrees, and
> > >
> > > (2) investigation and litigation of potential violations of laws with respect to Tobacco Products.

*A.D. Bedell Wholesale Co.*, 263 F.3d at 261 (citations to MSA omitted). In the case before us, there similarly seems to be active State supervision, in that sense, of the Contraband Statutes, the MSA, and the other associated statutes. Indeed, the Contraband Statutes themselves may be viewed as an effort closely tied to the active supervision of the MSA, its associated State statutes, and the resulting potentially anticompetitive conduct.

But, as the Third Circuit has also noted, *id.* at 260, the Supreme Court has said that "[t]he active supervision prong of the *Midcal* test requires that state officials

have and exercise power to review *particular anticompetitive acts* of private parties and disapprove those that fail to accord with state policy." *Patrick*, 486 U.S. at 101, 108 S.Ct. 1658 (emphasis added). The Third Circuit has applied that principle to a situation virtually indistinguishable from the one in the present case, concluding that, in the absence of state supervision of particular anticompetitive acts, the "active supervision" standard had not been met. *A.D. Bedell Wholesale Co.*, 263 F.3d at 261. I agree with the majority that the district court was wrong to grant Rule 12(b)(6) dismissal on the Sherman Act claims because we cannot conclude at the pleading stage that the "active supervision" part of the *Midcal* test has been met. "Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." *Patrick*, 486 U.S. at 101, 108 S.Ct. 1658. Because there is no such program of supervision reflected in what is before us, the *Parker* doctrine does not immunize the conduct of the defendants, at least not at this stage of the proceedings.

The State appears to have entered into the MSA and enacted the Escrow and Contraband Statutes as part of a comprehensive effort, *inter alia*, to settle its massive legal claims against the tobacco companies, to protect the substantial revenue promised by that settlement, and in the process, to protect State citizens (perhaps in part by driving up the price of cigarettes dramatically and erecting barriers to the success of discount cigarette importers). It is arguable that even without the particularized review called for by the Supreme Court, under the circumstances pleaded in this case, we can be confident that the scheme does not serve "merely the [tobacco companies'] individual interests," *id.;* that the "the state … has created the machinery for establishing" the MSA and its related statutes, *Parker,*

317 U.S. at 352, 63 S.Ct. 307, in such a way as to "effectively … ma[k]e [the anticompetitive] conduct its own," *Patrick,* 486 U.S. at 106, 108 S.Ct. 1658. But the Supreme Court's requirement of "active supervision" in the sense in which it uses that term seems to me to foreclose a conclusion at this stage of the proceedings that the plaintiffs' Sherman Act claims are barred by *Parker.*

In any event, this action is being returned to the district court for further proceedings. During the course of those proceedings, the State may be able to satisfy both *Midcal* factors as a matter of fact.

Finally, I note the majority's comment that "the State offers no reason why it used methods suppressing competition rather than a flat tax to achieve the same result," *ante* at 230, and that, "at this stage in the proceeding and given the allegations of the complaint, the goals of serving public health and enhancing revenue conflict. That is to say, the fewer cigarettes sold, the less threat to public health, but also the less revenue raised by the State, and vice versa," *id.* While the majority may have identified puzzling aspects of the MSA and its accompanying statutes and the political and economic considerations that led to them, I am not convinced that these observations are relevant to our inquiry. Nothing in *Parker, Midcal,* or their progeny suggests to me that *Parker* immunity turns on whether a federal court understands or approves of the regulatory measures the state chooses or that the State is required to justify its decision to select a less competitive course of action in place of a more competitive one. I do not know why the State did not employ a flat tax instead of the scheme that it adopted, but I doubt that it matters to us so long as we are assured that the State's program is

sufficiently articulated and supervised to be immune under the *Parker* doctrine.